MARTIN L. WELSH, ESQ.
Nevada State Bar No. 8720
LAW OFFICE OF HAYES & WELSH
199 North Arroyo Grande Blvd., Suite 200
Henderson, Nevada 89074
mwelsh@lvlaw.com
Phone: 702-434-3444
Fax: 702-434-3739
*Attorneys for Petitioners*

RECEIVED
SERVED ON
COUNSEL/PARTIES OF RECORD

FEB - 1 2018

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DOMAIN VAULT, LLC; NOVO POINT LLC; and QUANTEC LLC,

Petitioners,

vs.

RPV, LTD.,

Respondent.

**18-MS-4**

**MOTION TO QUASH SUBPOENA**

RPV, LTD., et al,

Plaintiffs,

Vs.

CHRISTOPHER A. PAYNE, et al,

Defendant.

Adversary No. 16-04110
(Bankruptcy Court, E.D. Texas)

Domain Vault LLC, Novo Point LLC, and Quantec LLC, petitioners, respectfully move this Honorable Court to quash a subpoena, attached as Exhibit A, served by RPV, LTD., upon Name.com, Inc., which commands said corporation to produce confidential, privileged trade secret records of the petitioners, their counsel, a relative of a former law

1

clerk of counsel for one of the petitioners, and the court recognized operations manager of Novo Point LLC and Quantec LLC.

## I. INTRODUCTION

RPV, LTD is a shell entity used by one Jeff Baron, who has been declared a 'vexatious litigant' by the U.S. District Court for the Northern District of Texas.[1]   Access to the requested information would allow Baron to obtain privileged, trade secret information that would allow him to target (further) victims of his vexatious litigations and to obtain private credit card and identity information, and secure access information which would allow Baron to destroy the economic value of tens of thousands of domain name assets, convert assets, obtain unauthorized access to computer systems and engage in identity theft. The challenged subpoena was served by Baron's counsel Leonard Simon, in violation of the Federal Rules and in violation of multiple protective orders issued by the District Court for the Northern District of Texas.[2]   The same counsel served a subpoena seeking the same information from the same third party, Name.com, Inc.,  in 2015,[3] and the subpoena was quashed by the United States District Court for the District of Delaware.[4] In the light of the exceptional circumstances presented, **request is made to transfer this motion to the District Court in the Eastern District of Texas pursuant to Fed. R. Civ. P. 45(f).**

…

…

---

[1]  See e.g., Exhibit B, Doc 268 in Northern District Case 3:09-cv-00988-L, ("N.D. Tex. Doc").  In addition to repeated discovery abuses, Baron, (directly and through confederates), has repeatedly filed vexatious suits alleging conspiracy theories against non-parties, counsel for adverse parties, a bankruptcy judge, the U.S. Marshals, and a senior U.S. District judge. *See* discussion by the U.S. Attorney, Doc 34 filed in case 4:12-cv-00753-RAS-DDB (E.D. Tex.).

[2] *See e.g.,* Exhibit C (N.D. Tex. Doc 1072).

[3] Exhibit D.

[4] Exhibit E.

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444 FAX (702) 434-3739

## II. BACKGROUND

In 2010 a receivership was imposed upon one Jeffrey Baron in an effort to curb his vexatious litigation activities, prevent his obtaining control over hundreds of thousands of domain name assets owned by third parties, and to secure payment to literally dozens of law firms for what has been described as Baron's 'ponzi scheme' of using new sets of unpaid lawyers to litigate with the prior levels of unpaid lawyers seeking recovery for unpaid legal services.

In October 2012, the United States District Court for the Northern District of Texas, issued a protective order in an effort to curb Baron's abusive discovery practices.[5]  The Court expressly prevented Baron from serving subpoenas such as the one involved in the instant proceeding, and ordered that the protective order be continuing in its effect.[6]  The underlying bankruptcy case in the Northern District of Texas is still active, and the district court action in the Northern District of Texas has been frozen pending the closing of the bankruptcy.  The protective orders issued by the N.D. Tex. Court expressly prohibits Baron and his counsel from viewing the information Baron, through the shell entity RPV, now seeks.[7]

The background of the efforts of Baron to obtain the prohibited material is best understood in the context of the Senior U.S. District Court Judge who described Baron's unceasing hyper-vexatious litigation as "beyond vexatious".[8]  Baron is currently suing dozens of unrelated entities, and has a pattern of suing attorneys of opposing parties and, through family

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444 FAX (702) 434-3739

---

[5] *Id.*

[6] N.D. Tex. Doc 14.  (References to N.D. Tex. are to case 3:09-cv-00988-L).

[7] Exhibit C (N.D. Tex. Doc 1072).

[8] Exhibit B explains the background of Baron's activities.

members and confederates, federal bankruptcy and district court judges who have rejected Baron's vexatious practice.[9]

Unfortunately, even as his repeated suits are dismissed as groundless, Baron simply re-files the same actions and discovery requests in different forums and/or under the name of sham entities.[10]   The initial confusion in the Courts is substantial, since Baron often files in the name of his opponents, and has a pattern of claiming that his adversaries' counsel actually represent him, and filing claims against opposing counsel for fraud, breach of fiduciary duty, etc.

In response to the receivership imposed upon Baron for his vexatious litigation and theft of services from dozens of law firms, (over sixty law firms to date), Baron has engaged in a ballooning campaign of vexatious litigation, suing an ever ballooning range of the entities involved, their counsel, the federal Bankruptcy Trustee, and his counsel, and the federal Receiver, his counsel, even the U.S. Marshals.

The reason Baron seeks the material subject of the instant proceedings is to expand his campaign of vexatious suits against purchasers of assets relating to the proceedings against Baron in the Northern District of Texas, and to gain access to the private records involved, and as a means to illicitly seize control of the assets and/or to engage in identity theft.   By publication of the information, Baron can substantially harm the value of the underlying assets.   Notably, in the N.D. Tex. protective orders, both Baron and his counsel are prohibited from viewing the information Baron now requests.

…

…

---

[9] See e.g., Doc 34 filed in case 4:12-cv-00753-RAS-DDB (E.D. Tex.);  N.D. Tex. cause no. 3:16-cv-01025-L.

[10] See e.g., Exhibit D,  the same subpoena served in 2015 in Delaware, and quashed by court order, and Exhibit E, the Delaware court order quashing the same.

4

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

LAW OFFICE OF
**HAYES & WELSH**
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVB., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444 FAX (702) 434-3739

## III. GROUNDS

The N.D. Tex. Court issued a protective order expressly prohibiting Baron and his counsel from having access to the information Baron's counsel, through the shell RPV. LTD, now seeks.  The N.D. Tex. Court previously quashed a subpoena seeking the same material.[11] Federal Rule of Civil Procedure 45(a)(4) requires that **before** a subpoena commanding the production of documents or ESI is served, "a notice must be served on each party."  Yet, in direct violation of Rule 45(a)(4), the subpoena served by Baron was served _without_ prior notice to any of the parties whose records Baron seeks.

The subpoenaed records constitute trade secret and privileged material.  The private information Baron seeks includes private phone contact information, credit card information, account passwords,  private asset lists,  trade secret information about income, etc.   By obtaining the private records he is seeking, Baron can literally steal the domain names (by using the access codes and passwords contained in the communications Baron seeks), as well as to target the domain names and interfere with their use.  These are well known issues with Baron.[12]

The N.D. Tex. Court has long recognized the trade secret nature of domain name portfolio lists, and has strictly prohibited Baron _and his counsel_ from acquiring information about the domain name lists of others.[13]  If Baron is allowed to acquire the records he seeks,

---

[11] N.D. Tex. Doc 1387.

[12] _See_ N.D. Tex. Doc 581 at pages 2-4; Docs 20 and 21.

[13] _See e.g._, N.D. Tex. Doc 1079 at page 2 ("this Court is concerned that Mr. Baron's counsel proposes simultaneously that Mr. Baron would not see the electronic files under an "Attorney's Eyes Only" protective order, yet that Mr. Baron's valuation is necessary as he is an expert on this issue. **Mr. Baron may not evade a protective order which would prevent him from personally viewing material**").

the value of the domain portfolios would be placed at substantial risk;  Baron has judicially admitted this fact.[14]

Even if Baron does nothing with the lists, that fact of Baron having possession of the information, can substantially diminish the value of the domain portfolios because it deters potential buyers and joint venture partners.[15]

The information Baron's counsel, through the sell RPV, LTD. now seeks has no relevance to the vexatious claims, (apparently seeking $30 Million in damages), brought against the counsel of Baron's opponent in several litigations *in the forum of the attorney's personal bankruptcy proceedings.*

The subpoena is a vexatious litigation tactic.  The claims Baron is asserting in the Eastern District of Texas bankruptcy proceedings,  were dismissed with prejudice against Baron, et. al., as groundless in a prior Texas state court action in which Baron, et.al., sued the same parties he complains of in the E.D. Tex. bankruptcy proceedings.   The same claims were also dismissed in multiple similar suits brought by Baron, et.al., in the Southern District of Florida,  Queensland Australia, the Cook Islands, and the bankruptcy court in the Northern District of Texas.

## IV. PRAYER

Based on the foregoing, this Honorable Court is requested to enter an order transferring this motion to the Eastern District of Texas.  In the alternative, this Honorable Court is requested to enter an order quashing the subpoena subject of these proceedings.

---

[14] *E.g.*, N.D. Tex. Doc 792-1 at page 18, (Baron states under penalty of perjury that disclosure of the domain information **is destructive** ... [it opens] critical development plans to **being stolen**, and would also in my opinion as a founder in the domain name industry, **massively multiply the litigation**")

[15] *See e.g.*, N.D. Tex. Doc 1071 at page 3 ("by obtaining information—particularly the electronic list of the domain names ... Baron will be in a position to ... ward off potential buyers")."

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444 FAX (702) 434-3739

Further, because the subpoena was served (1) in violation of the rules, and (2) for an improper purpose, substantial sanctions for discovery abuse may be appropriate. Accordingly, since RPV, LTD. is a shell entity with no assets, the Court is requested to consider the imposition of sanctions against Baron's counsel, who issued and served the instant subpoena.[16]

Dated:  January 31, 2018.

LAW OFFICE OF HAYES & WELSH

*/s/Martin L. Welsh*
MARTIN L. WELSH, ESQ.
Nevada State Bar No. 8720
199 North Arroyo Grande Blvd. Ste. 200
Henderson, NV 89074
*Attorneys for Petitioners*

---

[16] E.g., Doc. 46 in N.D. Tex. case 3:15-CV-232-L, citing  Baron, RPV, and their counsel Leonard H. Simon's "**history of disruptive conduct and abusive litigation tactics**".

# *Appendix Contents*

**TAB A**............................................................................................**3**

    EX A Subpoena on to Name.com, Inc...........................................4

**TAB B**............................................................................................**9**

    EX B 2.3.11 ND TEX Declaring Baron A Vexatious Litigant [

    268]..............................................................................................10

**TAB C**............................................................................................**32**

    EX C ND TX ORDER granting Motion for Protective Order

    Ordered by Judge Royal Furgeson on 10-19-2012) [1072]..........................33

**TAB D**............................................................................................**35**

    EX D same Baron Subpoena on Name.com in Delaware............................36

**TAB E**............................................................................................**41**

    Deleware ORDER Quashing same Subpoena in 2015..................................42

# TAB A

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

| EASTERN | District of | TEXAS |
|---|---|---|

In re   Christopher Anthoney Payne and Alyce Rygiel Payne
        _____Debtor_____

*(Complete if issued in an adversary proceeding)*
        RPV LTD. ET AL.

_____Plaintiff_____
CHRISTOPHER ANTHONEY PAYNE, ET AL.

_____Defendant_____

Case No.   16-41533

Chapter   13

Adv. Proc. No.   16-04110

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

NAME.COM, INC, C/O CSC SERVICES

To:     2215-B RENAISSANCE DR., LAS VEGAS, NV 89119
        *(Name of person to whom the subpoena is directed)*

[x] *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
        See Exhibit A, attached hereto.

| PLACE   Junes Legal Services, Inc.<br>630 S 10th St # B, Las Vegas, NV 89101 | DATE AND TIME<br>February 1, 2018,   4PM. |
|---|---|

[ ] *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   1/18/2018

CLERK OF COURT

                                        OR

_____          _____
Signature of Clerk or Deputy Clerk              Attorney's signature

The name, address, email address, and telephone number of the attorney representing *(name of party)*
RPV, LTD.
_____, who issues or requests this subpoena, are:
Leonard Simon, Pendergraft & Simon, LLP, 2777 Allen Pkwy, Suite 800, Houston, TX 77019   Phone: 713-253-2810

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

APPENDIX  Page 3

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

      I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 3)

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
...
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

## Exhibit A

### DEFINITIONS:

1) **Portfolio**   Two certain groups of domain names consisting of approximately 3,000 domain names owned by Novo Point, LLC and approximately 150,000 domain names owned by Quantec, LLC.

2) **Accreditation Agreement**  Registrar Accreditation Agreement between you and the Internet Corporation for Assigned Names and Numbers (ICANN)

### SUBPOENAED DOCUMENTS:

1. Concerning all domain names currently or previously registered by Novo Point, LLC, Quantec, LLC, Domain Vault, LLC, Domain Protection, LLC, Shawn Frazin a/k/a Mort Katz a/k/a Isaac Katz a/k/a Dan Katz, Lisa Katz a/k/a Elisa Katz, Gary Schepps, Christopher Payne, or Andrew Powell, all documents containing information that you are required to maintain pursuant to your Accreditation Agreement, including:
    a. The name of the registered domain name (hereinafter "Registered Name");
    b. The IP addresses of the primary nameserver and secondary nameserver(s) for the Registered Name;
    c. The corresponding names of those nameservers;
    d. Unless automatically generated by the registry system, the identity of the Registrar;
    e. Unless automatically generated by the registry system, the expiration date of the registration; and
    f. Any other data the Registry Operator requires be submitted to it.
    g. Any correspondence concerning compliance with your agreement to ICANN's Uniform Domain-Name Dispute-Resolution Policy ("UDRP")
    h. The original creation date of the registration;
    i. The expiration date of the registration;
    j. The name and postal address of the Registered Name Holder (as defined in your Accreditation Agreement);
    k. The name, postal address, e-mail address, voice telephone number, and (where available) fax number of the technical contact for the Registered Name; and
    l. The name, postal address, e-mail address, voice telephone number, and (where available) fax number of the administrative contact for the Registered Name.
2. All documents concerning or related to the Account Holder(s), including documents identifying all IP addresses which have accessed the accounts containing domain names in the Portfolio
3. Documents sufficient to show funds received, and sources thereof, from Novo Point, LLC, Quantec, LLC, Domain Vault, LLC, Domain Protection, LLC, Shawn Frazin a/k/a Mort Katz a/k/a Isaac Katz a/k/a Dan Katz, Lisa Katz a/k/a Elisa Katz, Gary Schepps, Christopher Payne, or Andrew Powell for registration of domain names for the period from January 1, 2010 to the present.
4. All contracts, agreements relating to the possession, management, valuation, sale or purchase of domain names in the Portfolio.
5. Any and all communications between you and Novo Point, LLC.
6. Any and all communications between you and Christopher Payne.
7. Any and all communications between you and Gary Schepps

8. Any and all communications between you and Quantec, LLC.
9. Any and all communications between you and Domain Vault, LLC.
10. Any and all communications between you and Domain Protection, LLC.
11. Any and all communications between you and Shawn Money Frazin (a/k/a Mort Katz, a/k/a Isaac Katz, a/k/a Dan Katz)
*12.* Any and all communications between you and Lisa Katz (a/k/a Elisa Katz).
13. Any and all agreements between you and Novo Point, LLC.
14. Any and all agreements between you and Quantec, LLC.
15. Any and all agreements between you and Christopher Payne.
16. Any and all agreements between you and Domain Vault, LLC.
17. Any and all agreements between you and Domain Protection, LLC.
18. Any and all agreements between you and Shawn Frazin (a/k/a Mort Katz, a/k/a Isaac Katz a/k/a Dan Katz).
19. All documents and electronically stored information showing gross income, hits, or other statistical data or analysis of each domain name in the Portfolio.
20. Documents sufficient to show money paid, including identification of recipient accounts, concerning domain names in the Portfolio

# TAB B

# Exhibit B



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB - 3 2011

CLERK, U.S. DISTRICT COURT
By _____ M.F.
Deputy 2:43 p.m.

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| NETSPHERE, INC., MANILA INDUSTRIES, INC., AND MUNISH KRISHAN, | § § § | Case No. 3:09-CV-988-F |
| Plaintiffs, | § § | |
| v. | § § | |
| JEFFREY BARON AND ONDOVA LIMITED COMPANY, | § § § | |
| Defendants. | § | |

**ORDER DENYING EMERGENCY MOTION TO VACATE ORDER APPOINTING RECEIVER AND IN THE ALTERNATIVE, MOTION FOR STAY PENDING APPEAL**

BEFORE THE COURT is Defendant Jeffrey Baron's Motion to Vacate Order Appointing Receiver and in the Alternative, Motion for Stay Pending Appeal (Docket No. 137), filed on December 3, 2010 (hereinafter, Jeffrey Baron will be referred to as "Baron"). Defendant's Motion for Emergency Consideration was granted and a hearing was held in this matter on December 17, 2010. After hearing initial arguments from the parties, the Court continued the hearing to January 4, 2011 to give full evidentiary consideration to the receivership issue. After considering the numerous filings on this issue, the arguments of the parties and the evidence present at the hearing, the Court DENIES Defendant's Motion to Vacate Order Appointing Receiver and in the Alternative, Motion for

1

Stay Pending Appeal (Docket No. 137) and continues the Receivership in full force and effect, as set forth hereafter.

## CASE SUMMARY

Baron has been a vexatious litigant in a series of lawsuits, including the instant action and a related bankruptcy action. To bring an end to his vexatiousness, which was jeopardizing the Court's ability to protect its own orders and jeopardizing an agreed-upon global settlement of all litigation, the Court granted an emergency motion to create a receivership over Baron's assets. Based upon the Court's knowledge of Baron's conduct during the pendency of this action and the bankruptcy action, the Court had ample reason to act preemptively. The Court then held an evidentiary hearing as soon as possible thereafter to consider whether the receivership should be dissolved or continued. The hearing clearly established the need for the receivership to remain in place, and this Order accordingly so holds.

## BACKGROUND

This case arose out of a business venture between Baron and Mr. Munish Krishan ("Krishan") involving the ownership of hundreds of thousands of domain names and generating millions of dollars of income yearly. "In the Internet, a domain is a place you can visit with your browser—i.e. a World Wide Web site. . . . the domain name is the address that gets you there, and consists of a hierarchical sequence of names (labels) separated by periods (dots)." Harry Newton, Newton's Telecom Dictionary 390 (Flatiron Publishing 2009). After

2

the venture disintegrated, Baron and Krishan began suing each other. The dispute between Baron and Krishan generated at least seven lawsuits in Texas, California, and the Virgin Islands. Baron operates many of his business activities off shore, in jurisdictions outside the reach of United States Courts.

On April 26, 2009, after years of litigation and four mediation attempts, Baron, Krishan and the other parties involved reached a global settlement and signed a Memorandum of Understanding ("MOU") in connection with a state action in Dallas, Texas. Within a few weeks after the MOU was signed, Baron and the company through which he primarily did business, Ondova Limited Company ("Ondova"), allegedly breached the MOU. On May 28, 2009, this lawsuit was filed by Krishan and his companies Netsphere Inc. and Manila Industries Inc. to enforce the MOU.

On June 26, 2009, the Court entered a preliminary injunction in an effort to maintain the status quo under the MOU. *See* Docket No. 22. On July 1, 2009, the Court held a hearing in this case to address issue of non-compliance with the preliminary injunction. The preliminary injunction was amended on July 6, 2009, to include penalties of $50,000 per day for any violation. The Court held another hearing in this case on July 9, 2009, to discuss issues regarding the preliminary injunction. At both hearings, the Court expressed deep concern with the multitude of lawyers who kept appearing in the case to represent Baron. In an effort to end the turmoil created by the revolving door of attorneys, the Court ordered that Baron's fourth set of lawyers, Friedman & Feiger, would continue to represent Baron

3

throughout the remainder of the case and set aside funds to pay the firm's fees. The Court also ordered that Baron was not to hire or fire any more attorneys without first seeking leave of the Court.[1] Despite the Court order, Baron continued to retain and terminate attorneys, without leave of Court.

On July 21, 2009, Plaintiffs filed a Motion for Contempt, seeking relief in connection with Baron's and Ondova's alleged violations of the terms of the Preliminary Injunction Order and for violation of Federal Rule of Civil Procedure 13 by refusing to act in good faith with respect to discovery matters. *See* Docket No. 41. A hearing on this motion was set for July 28, 2009. The Court also intended to raise at the hearing the issue of the revolving door problem created by Baron's hiring and firing of additional lawyers. *See* Docket No. 46 (Defendant's Motion to Continue Hearing states that hearing was set for July 28, 2009). The day before the contempt hearing was to take place, on July 27, 2009, Baron placed Ondova in bankruptcy by filing a Chapter 11 proceeding here in the Northern District of Texas. *See* Docket No. 48 (Suggestion of Bankruptcy and Notice of Stay). Ultimately, because of Baron's disregard for his duties to the bankruptcy estate and other misconduct identified by the Bankruptcy Court, the Bankruptcy Court appointed a Chapter 11 Trustee of Ondova on September 11, 2009.

Eventually, a global settlement agreement was reached in the Bankruptcy Court as to

---

[1] Friedman & Feiger filed its Motion to Withdraw as counsel for Baron on January 26, 2010 citing an irreconcilable conflict of interest. *See* Docket No. 81.

4

all litigation. Baron signed the agreement. Thereafter, however, Baron continued to hire new lawyers and took actions placing the settlement in jeopardy. In addition, because of Baron's continued excessive hiring and firing of lawyers and his refusal to pay many of his lawyers, claims for legal fees began to arise in the bankruptcy proceedings, further jeopardizing the settlement that Baron himself had approved. In an effort to resolve these claims, the Bankruptcy Court recommended that this Court appoint a mediator to conduct a mediation among the Bankruptcy Trustee, Baron, and the various attorneys who were making claims for reimbursement against the Ondova bankruptcy estate. *See* Docket No. 118.

The Court adopted the Bankruptcy Court's recommendation and ordered Peter Vogel to mediate all claims for legal fees against Baron. *See* Docket Nos. 119, 120, and 122. However, this attempt to resolve the claims for fees failed because Baron again fired his counsel. Faced with the potential of an inexhaustible number of Baron lawyers and Baron claims, the Bankruptcy Court *sua sponte* identified the remedy of a receiver for Baron.

On November 24, 2010, the duly-appointed Chapter 11 Trustee of Ondova, Daniel J. Sherman ("Trustee"), filed an Emergency Motion for Appointment of a Receiver over Baron. *See* Docket No. 123. The Trustee cited Baron's failure to cooperate in the process outlined in the Court's October 13, 2010 Order to mediate the claims against Baron for legal fees and Baron's continuous hiring and firing of attorneys as reasons why the emergency appointment of a receiver was necessary. The Trustee explained that Baron had continued to hire and fire attorneys in violation of this Court's Order and that his actions, if continued, would frustrate

5

the administration of the bankruptcy case and place the Ondova bankruptcy estate at risk due to a continued stream of Baron's attorneys making claims against the estate. Because of the Court's experience with this case and the Court's thorough knowledge of Baron's conduct as a vexatious litigant, the Court granted the emergency motion, based on concerns that Baron was jeopardizing the global settlement reached in the bankruptcy action. The Court was also concerned that Baron's offshore operations placed many of his assets outside the Court's jurisdiction.

Although the initial receivership order was entered without notice to Baron, the Court intended to hold a hearing on this matter as soon as possible to fully consider presentations by both parties regarding the necessity of continuing the appointment of a receiver for Baron. After a full evidentiary hearing, the Court affirms that the appointment of a receiver for Baron was and continues to be necessary and is the least restrictive means available to control the proceedings before the Court. Therefore, Baron's Motion to Vacate Order Appointing Receiver and in the Alternative, Motion for Stay Pending Appeal is DENIED.

## DISCUSSION

The Court has an inherent power to control the proceedings before it and "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1417 (5th Cir. 1995) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630 (1962)); *F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 584 (5th Cir. 2008) (recognizing the district court's inherent power to control the proceedings before it).

Because of the Court's experience with Baron and this litigation, the Court initially agreed with the Trustee that an emergency order placing Baron in receivership was the most restrained way to protect the jurisdiction not only of this Court but also of the Bankruptcy Court over on-going proceedings. After hearing from Baron's witnesses on January 4, 2011, which included several attorneys who had previously worked for Baron, a mental health professional, and Baron himself, it is clear to the Court that the appointment of a receiver for Baron continues to be necessary to serve the interests of justice. Accordingly, the Court makes the following findings of fact and conclusions of law in support of its decision to continue the receivership and to deny Baron's Emergency Motion to Vacate or Stay the Order Appointing Receiver.

### A.   Baron has Hired and Fired Counsel in Bad Faith as a Means of Delaying Court Proceedings

Throughout this dispute, Baron has retained nineteen different law firms to represent him or his company Ondova. *See* Docket No. 170, Exhibit 1 (a list of firms that have been hired to represent Baron in this and related cases); *see also* Docket No. 118 (Judge Jernigan's Report and Recommendation listing all the attorneys involved in this case). The following is a detailed account of how Baron has delayed and obstructed Court proceedings by his actions in hiring and firing attorneys. There has been no good cause for him to do so.

The first attorneys to make an appearance in this Court on behalf of Baron were Anthony L. Vitullo of the firm Fee, Smith, Sharp & Vitullo, LLP; James Bell of Bell & Weinstein; and Caleb Rawls of the Law Offices of Caleb Rawls. These attorneys made an

7

appearance on behalf of Baron and Ondova during a telephone conference on June 12, 2009. *See* Docket No. 10 (Sealed Minute Entry); Docket No. 12 (Sealed Transcript of TRO telephone conference). On June 22, 2009, all three attorneys that represented Baron and Ondova filed a Motion to Withdraw as Counsels of Record because of "un-resolvable conflicts" with Baron. *See* Docket No. 15.

On June 23, 2009, Mr. Lawrence J. Friedman, Mr. James Robert Krause, Mr. Ernest W. Leonard, and Mr. Ryan K. Lurich of the firm Friedman & Feiger, L.L.P. filed a notice of appearance on behalf of Baron and Ondova. *See* Docket No. 18. At the hearing held in this matter on July 1, 2009, the Court noted that this was the ninth set of lawyers to work for Baron during the pendency of all of his litigation and ordered that money be put in a trust account for these particular attorneys in an attempt to ensure that they would be paid and would remain for the duration as Baron's counsel. *See* Docket No. 38 at 54 (Transcript from July 1, 2009 hearing). The Court also made it clear at this hearing that Baron was not to hire or fire any attorneys without leave of the Court.

The Court was scheduled to hear arguments on Plaintiff's Motions for Contempt on July 28, 2009; however, at this hearing the Court learned that Ondova had suddenly filed bankruptcy the night before. Therefore, the automatic stay prevented the Court from ruling on this issue and from *sua sponte* addressing the issue that Baron continued to retain counsel without leave of court. On July 28, the Court was made aware that it was not the Friedman & Feiger counsel who made the decision to file bankruptcy but that it was another attorney

8

who had been advising Baron, Mr. Jay Kline, who initiated the bankruptcy filing with the

help of another attorney not of record, Mr. Paul Keiffer of Wright Ginsberg Brusilo P.C. *See*

Docket No. 52 at 12 (Transcript of July 28, 2009 hearing). The Court expressed concern as

to why Mr. Kline was making decisions for Baron and Ondova without contacting the

Friedman & Feiger counsel of record. *Id.* at 20. Attorneys from Friedman and Feiger stated

that it was their opinion that the bankruptcy filing, done without their knowledge, was not

in their clients' best interest. *Id.* at 13. The Court reiterated that all issues concerning this

litigation would be directed to the Friedman & Feiger counsel, not Mr. Kline. *Id.* at 21-22.

At the January 4, 2011 hearing the Court took notice of the Bankruptcy Court's finding that

the bankruptcy action was filed for the improper purpose of avoiding the contempt hearing

before this Court. *See* Docket No. 233 at 62.

As stated above, the initial bankruptcy filing was done by Mr. Keiffer of Wright

Ginsberg Brusilow P.C. on July 27, 2009. However, on September 1, 2009, Wright Ginsberg

Brusilo, P.C. filed a Motion to Continue the hearing on Debtor's Assertion of No Perfected

Lien on Debtor's Pre-Petition Cash Collateral and a Motion for Setting and Request for

Emergency Hearing on Debtor's Emergency Motion for Continuance, which was set to be

heard at 9:30 a.m. that morning. *See* Bankruptcy Docket Nos. 54, 55. In said Motions,

Counsel explained that he had received an email from Baron at 6:20 a.m. that morning stating

that he was "hereby terminated, effective immediately from any and all representative

capacities for Ondova Limited Company in the above referenced matter . . . I ask you to file

a Motion to Continue the hearing on the cash collateral scheduled for tomorrow and present the motion to the court in the morning." *See* Bankruptcy Docket No. 54 at 2-3.

On September 2, 2009, the Bankruptcy Court entered an Order to Show Cause why a Chapter 11 Trustee should not be appointed. *See* Bankruptcy Docket at 56. One of the Bankruptcy Court's concerns was the Debtor's history of "playing 'musical lawyers'" and its September 1, 2009 attempt to fire bankruptcy counsel and delay a hearing set for the same day. *Id.* at 3-4. Wright Ginsburg Brusilow, P.C. was ultimately allowed to withdraw as Counsel for Debtor on October 1, 2009, and the Bankruptcy Court appointed a Trustee to oversee the bankruptcy estate. *See* Bankruptcy Docket No. 108.

On October 17, 2009, Baron filed a Notice of and Motion to Approve Additional Counsel in this Court. *See* Docket No. 69. In this Notice, he requested that the Court approve the hiring of Mr. Jeffrey T. Hall as additional civil counsel to assist Friedman & Feiger, L.L.P and Mr. Stephen Jones as criminal counsel for Baron. There was no objection to his hiring these additional attorneys. On January 26, 2010, Friedman & Feiger, LLP filed their Motion to Withdraw as Counsel citing an "irreconcilable conflict of interest" between themselves and Baron. *See* Docket No. 81. The Court granted this Motion. *See* Docket No. 83.

On February 19, 2010, the Court ordered all parties to participate in a settlement conference or mediation. *See* Docket No. 91. After working for several months on resolving this case, Mr. Hall filed his Motion to Withdraw as Attorney for Baron on April 19, 2010.

10

*See* Docket No. 101. Mr. Hall states in his Motion that "Baron has refused to fulfill his financial obligations to the lawyer; and, the continued representation of Baron in this matter will impose an unreasonable financial burden on the lawyer." *Id.* at 2. Mr. Hall withdrew his initial Motion to Withdraw and agreed to continue to represent Baron in the settlement discussion.

However, shortly after Mr. Hall agreed to continue representing Baron, the Court received reports that another attorney not of record, Mr. Gary Lyon, was representing Baron at settlement discussions and delaying that process. Accordingly, the Court issued an order reminding the parties of the Court's previous order requiring Court approval of any new or additional counsel for Baron and ordering Mr. Lyon to file a Motion to Approve Additional Counsel if he intended to represent Baron. *See* Docket No. 105. No such motion was filed.

On August 20, 2010, Mr. Hall filed a Joint Motion to Withdraw as Attorney for Baron requesting that Mr. Gary Lyons be substituted as counsel of record. *See* Docket No. 113. Mr. Lyons filed his Notice of Appearance on August 26, 2010. *See* Docket No. 114. Mr. Lyons testified at the January 4, 2011 hearing that he actively represented Baron from April 25, 2010, until October 2010. *See* Docket No. 233 at 37-38. The Court granted Mr. Lyon's oral motion to withdraw at the January 4, 2011 hearing. A written order was entered on January 7, 2011. *See* Docket No. 219.

It is clear that Baron's hiring of new counsel was used repeatedly as a tactic to delay and obstruct the progress of the proceedings. It is also clear that Baron would fire his

11

counsel anytime there was an important hearing or the case was nearing settlement, again for purposes of delay and obstruction.   While any individual change of counsel would be unexceptional, the changes in this and other lawsuits taken together demonstrate a vexatious and bad faith use of lawyers by Baron that exceeds anything that this Court has ever observed.   And it began from the very outset of this case.

**B.      Baron's Vexatious Litigation Tactics Have Increased the Cost of this Litigation for All Parties**

Baron's vexatious litigation tactics described above have not only prevented the fair and efficient administration of the bankruptcy estate and delayed the progress of this case, but those tactics have been used to harass the other parties and significantly increase the cost of this litigation.   Baron's vexatious litigation tactics have caused the Plaintiff, the Chapter 11 Trustee, and even his own counsel to incur significantly more in attorneys' fees and expenses than was reasonably necessary to participate in this case and the bankruptcy case. When Baron was asked at the January 4, 2011 hearing whether he purposely engaged in conduct that was designed to increase the cost of litigation for Plaintiffs and the Chapter 11 Trustee, he invoked his Fifth Amendment right not to incriminate himself.   *See* Docket No. 233 at 234.   The Court draws a negative inference from Baron's invocation of the Fifth Amendment, as it is allowed to do in civil proceedings.   *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (holding that Fifth Amendment "does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them").

12

Accordingly, the Court finds that the appointment of a receiver over Baron is necessary to stop his vexatious litigation tactics from further increasing the cost of this litigation and from unnecessarily hindering the administration of the bankruptcy estate. If the Court were to allow such unnecessary costs to continue it would only serve to deprive Plaintiffs of their right to unimpaired access to the federal courts and to an efficient adjudication of the claims asserted.

### C.   Baron's Practice of Hiring and Firing Attorneys Exposed the Ondova Bankruptcy Estate to Significant Expense

On October 13, 2010, Bankruptcy Judge Jernigan filed a Report and Recommendation suggesting that Peter Vogel be authorized and directed to mediate attorneys fees issues. *See* Docket No. 118. Judge Jernigan's report noted that the "Global Settlement Agreement" had been substantially consummated, but that the Court had lingering concerns. Specifically, the Bankruptcy Court was concerned that Baron's hiring-and-firing of lawyers "may be exposing the Ondova bankruptcy estate to possible administrative expense claims for amounts owed to attorneys that Jeffrey Baron should pay or entities with which he is connected (Quantec, Village Trust, etc.) should rightfully pay." *Id.* at 4. Judge Jernigan provided this Court with a detailed account of "the cavalcade of attorneys" associated with this case. *See id.* at 4-7. Many of these attorneys are not mentioned in this Order because they did not appear as counsel of record in this or the Bankruptcy Court, but were retained by Baron without Court approval. This list thoroughly details all of the attorneys who have and may have claims on the Ondova bankruptcy estate and the amounts of their claims. *Id.*

13

After reviewing this list of potential claims, it was clear to the Court that if Baron was allowed to continue his current practice of disregarding court orders and hiring additional counsel, the Ondova bankruptcy estate would be exposed to an endless stream of claims. At the same time, a settlement agreement that took months of careful negotiation and that Baron signed would be nullified, to the great harm of countless parties, who other than Baron worked in good faith to resolve difficult issues.

### D.   Baron has Repeatedly Ignored Court Orders

This Court ordered Baron on several occasions not to hire additional counsel without Court approval. However, as explained above and evidenced by the record, Baron repeatedly ignored this Court's order. Additionally, Judge Jernigan also prohibited Baron from hiring attorneys without Court permission. Judge Jernigan explained in her report that Baron had been given the option of retaining Mr. Lyon and Mr. Martin Thomas though the end of the bankruptcy or he could proceed *pro se*, but that if he chose to proceed *pro se* and did not cooperate in connection with final consummation of the global settlement agreement, the Bankruptcy Court would recommend the appointment of a receiver to seize Baron's assets and perform his obligations under the Global Settlement Agreement. Docket No. 118. at 9.

In the Trustee's Emergency Motion for Appointment of Receiver, he informed the Court that Baron had once again disregarded both Courts' orders against hiring new counsel and hired a new attorney, Mr. Sydney Chisen, to represent him in the bankruptcy case. Baron did not receive permission from this Court or the Bankruptcy Court to retain Mr. Chisen.

14

Additionally, the Trustee informed the Court that Mr. Thomas was terminating his legal representation of Baron because he had not been paid and Baron had filed a grievance against him. The Trustee also informed the Court that Baron had been advised that his appearance at a November 17, 2010 Bankruptcy Court hearing was essential, but that Baron had failed to appear.

In his Emergency Motion, the Trustee also provided the Court with a copy of a petition filed in state court by another attorney formerly retained by Baron, Mr. Robert J. Garrey, who is suing Baron and his companies for theft of services, fraud and breach of contract. In the Trustee's motion, he informed the Court that another attorney, Mr. Stan Broome, who was hired by Baron to represent him in the Court-ordered mediation regarding unpaid attorney's fees, had filed a Motion to Withdraw because he had not been paid. The Court learned that another attorney participating in the Court-ordered mediation efforts regarding unpaid attorney's fees contacted the Trustee because Baron and his legal team had failed to communicate with him regarding the mediation procedure. This information was consistent with the information garnered by the Court during its history with Baron in the litigation, leaving it clear that Baron continued to ignore this Court's orders and the orders of the Bankruptcy Court to stop hiring counsel and to cooperate with the ordered mediation, continuing to obstruct all ongoing court proceedings.

After hearing the testimony at the January 4, 2011 hearing, the Court found that Baron had and has no intention of complying with the settlement agreement that he has signed.

15

*See* Docket No. 233 at 207. Accordingly, it is clear that nothing short of appointing a receiver to control his assets would stop his obstruction of this case and the bankruptcy proceedings. No evidence was presented at the hearings held on this matter to suggest that Baron had some legitimate reason to violate this Court's or the Bankruptcy Court's orders. In fact, when Baron was asked whether he purposefully violated the orders of this Court and the Orders of the Bankruptcy Court, Baron invoked his Fifth Amendment right not to incriminate himself. *Id.* at 234. The Court draws a negative inference from Baron's invocation of the Fifth Amendment, as it is allowed to do in civil proceedings. *See Baxter*, 425 U.S. at 318.

Accordingly, the Court finds that there is clear and convincing evidence of Baron's contempt of Court. *See United States v. City of Jackson*, 359 F.3d 727, 731 (5th Cir. 2004) (holding that civil contempt requires "clear and convincing evidence that (1) a court order was in effect, (2) the order required specified conduct by the respondent, and (3) the respondent failed to comply with the court's order"). Therefore, it is in the Court's discretion to employ judicial sanctions "for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of America*, 330 U.S. 258, 303-304 (U.S. 1947). As such, it would have been well within the Court's discretion to issue monetary sanctions against Baron for all the money his vexatious tactics have cost the other parties in this case. *See id.* ("Where compensation is intended, a fine is imposed, payable to the complainant.").

16

Additionally, the Court could have held Baron in jail until he complied with the Court's Orders. *See id.* ("[W]here the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired."). However, after considering the character and magnitude of the harm threatened by Baron's continued contumacy, the Court is of the opinion that the appointment of a receiver over Baron is the most effective and least restrictive means to ensure his compliance with Court orders.

### E.     Baron Repeatedly Hired Attorneys in Bad Faith Without the Intention of Paying Them

Mr. Lyon, Mr. Dean Ferguson, and Mr. Gerrit Pronske all formerly represented Baron and all testified at the January 4, 2011 hearing. Mr. Lyon testified that he had settled a portion of his attorney's fees with Baron "based upon facts that Baron gave that I have since found out were not true." Docket No. 233 at 37. Mr. Lyon testified that he had witnessed Baron promising to pay attorneys their fees, but that he had not in fact paid those attorneys. *Id.* at 60-61. When asked if he had made any conclusions, based upon the representations that were being made by Baron and by his subsequent conduct, about whether he actually intended to perform those promises, Mr. Lyon concluded "[t]hat Jeff hires people, hired me, for the purpose of getting as much work out of me as possible and paying me as little as possible and preferably nothing." *Id.* at 61.

Mr. Ferguson was asked about his participation in the court-ordered mediation and

17

he testified as follows:

> [I]t became clear to me in trying to reach out to Jeff that no mediation was going to succeed if Jeff was involved in it. In Jeff's view the attorneys were entitled to zero. Irrespective of the fact that he acknowledged the work was done, that he had agreed to the amount that I had done and agreed that I did good work for him. He felt that I should be paid zero, and that seemed to be from the experience with Mr. Pronske and the other attorneys I was aware of his modus operandi. He felt whoever his former attorneys were, they were not entitled to anything.

*Id.* at 81-82. Mr. Ferguson also testified that, in retrospect, Baron was a vexatious litigant.

*Id.* at 95. Mr. Ferguson also testified that, by the end of his representation of Baron it appeared that Baron would hire a lawyer and get them to work as long as he could for little or no money and then when payment was demanded he would replace that lawyer with another one and do the same thing over again. *Id.* at 98. Finally, Mr. Ferguson testified that it was his opinion that when Baron promised to pay him for his services he did not intent do pay. *Id.* at 100. Mr. Pronske gave the following testimony about Baron's pattern of not paying attorneys:

> [F]rom what I know about his situation with not paying numerous other attorneys is that there is a pattern of using attorneys until a bill is submitted and then not paying that bill and getting as much out of that attorney as he can and then finding a problem with what they have done with the intention to not pay that attorney.

*Id.* at 188.

When Baron was questioned about whether he defrauded particular lawyers and whether he engaged in a pattern and practice of such fraud, Baron invoked his Fifth Amendment right not to incriminate himself. *Id.* at 232. The Court draws a negative

18

inference from Baron's invocation of the Fifth Amendment as it is allowed to do in civil proceedings. *See Baxter,* 425 U.S. at 318. Therefore, based on the record, including the testimony of Baron's former attorneys at the January 4, 2011 hearing, the Court finds that Baron has engaged in a consistent pattern and practice during this federal litigation of defrauding his own counsel by making promises to pay them for their services which he did not intend to perform at the time he made those promises and which promises were reasonably relied upon by said counsel to their detriment. Accordingly, because of this practice the Court is of the opinion that the appointment of a receiver is necessary.

**F.      The Appointment of a Receiver is Necessary to Stop Baron from Attempting to Transfer Funds Outside the Jurisdiction of the United States**

At the January 4, 2011 hearing, Mr. Pronske testified that he knew Baron "was going to be moving money offshore for the sole purpose of the Courts of United States not having jurisdiction over that money. And that was the reason that Baron filed a lawsuit against me, a restraining order, preventing me from saying that in Judge [Jernigan's] court, and later Judge [Jernigan] ordered me to testify what I knew about that which I did." *See* Docket No. 233 at 157. After hearing the testimony from Mr. Baron's attorneys, combined with all of the Court's experience with Baron, the Court finds that Baron utilizes numerous companies and trusts as part of his ongoing attempts to put assets beyond the reach of the courts of the United States, contrary to the advise of his counsel, and without observing the proper separation between himself and those entities. Because there is an adversary proceeding

currently pending between Mr. Pronske's firm and Baron in the Bankruptcy Court, in which

the Mr. Pronske's firm is seeking recovery of attorneys' fees from Baron, the Court has a

direct interest in maintaining its jurisdiction over Baron's assets and any of his alter ego

companies or trusts for the purpose of being able to afford complete relieve on the claim of

Mr. Pronske's firm.   Additionally, the Court has a direct interested in maintaining its

jurisdiction over Baron's assets for the purpose of being able to afford complete relief on any

substantial contribution claims by the Chapter 11 Trustee for indemnity against Baron.

Because all prior attempts to stop Baron's bad faith and vexatious behavior have failed, the

Court finds that appointing a Receiver over Baron's assets is the only way to ensure that the

Court maintains jurisdiction over Baron's assets so that justice is done in this case.

## G.   Baron has Not Met the Standard for Stay Pending his Appeal of the Court's Order Appointing a Receiver

"[F]our factors must be considered in determining whether appellants have shown

sufficient reason for granting the extraordinary remedy of stay pending appeal." *Belcher v.*

*Birmingham Trust Nat. Bank*, 395 F.2d 685, 686 (5th Cir. 1968). The first factor is a strong

showing that they are likely to succeed on the merits of the appeal; the second factor is

whether movants have shown that unless a stay is granted they will suffer irreparable injury;

the third factor is whether a stay would substantially harm other parties to the litigation; and

the fourth factor is whether a stay is in the public's interest. *Id.* As stated above, the Court

has inherent authority to control the proceedings before it and do what is necessary to enforce

its own orders. Because of Baron's consistent disregard for this Court's orders, the Court is

20

of the opinion that appointing a receiver over Baron's assets is the least restrictive way to administer justice in this case. Therefore, the Court finds that Baron is not likely to succeed on the merits of his appeal.

Furthermore, the Court finds that the order appointing a receiver is doing no irreparable harm to Baron. The Receiver has been ordered to pay all of Baron's living expenses, including health expenses. Additionally, the Receiver has been responsive to all of Baron's financial needs. The Court is of the opinion that if the stay is granted there would be substantial harm to all of the other parties to this litigation. As Baron's past behavior indicates, if Baron is allowed to control his assets he will use them to ensure that this dispute and all ancillary disputes will never be resolved. Finally, the Receivership is in the public's best interest because it greatly benefits the public when a Court is allowed to take the most restrained path to ensure that its orders are followed and the justice can be administered.

Accordingly, the Court finds that Baron has not met his burden to show that the Court should stay the Receivership pending his appeal to the Fifth Circuit.

## CONCLUSION

In conclusion, Baron's behavior in all of these proceedings has not only been vexatious and contumacious and harmful to all other parties, but it has also been harmful to him. It is inexplicable why a litigant would take actions which, in the end, are so clearly against his own self interest. That being said, the only conclusion this Court can reach is that Baron will never conform to Court orders and, without a receivership, will forever thwart the

proper administration of justice. Therefore, for the reasons stated above, Defendant Jeffrey

Baron's Motion to Vacate Order Appointing Receiver and in the Alternative, Motion for Stay

Pending Appeal is DENIED. After due hearing, the Court is of the opinion that the

Receivership, as originally set forth, must continue in full force and effect until further order

of the Court.

It is so ORDERED.

SIGNED this 3rd day of February, 2011.

Royal Furgeson
Senior United States District Judge

# TAB C

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NETSPHERE, INC., | § | |
| MANILA INDUSTRIES, INC., AND | § | |
| MUNISH KRISHAN | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:09-CV-0988-F |
| | § | |
| JEFFREY BARON AND | § | |
| ONDOVA LIMITED COMPANY, | § | |
| | § | |
| DEFENDANTS. | § | |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ONDOVA LIMITED COMPANY, | § | CASE NO. 09-34784-SGJ |
| | § | (CHAPTER 11) |
| DEBTOR. | § | |

## ORDER GRANTING THE RECEIVER'S EMERGENCY MOTION FOR PROTECTIVE ORDER AND DISCOVERY CONTROL ORDER

On this day, came on to be heard The Receiver's Emergency Motion for Protective Order
and Discovery Control Order in the above entitled and numbered cause, and the Court, having
considered same, is of the opinion that said Motion is well taken and should be GRANTED.

IT IS THEREFORE ORDERED that The Receiver's Emergency Motion for Protective
Order and Discovery Control Order is **GRANTED**. Defendant Jeffrey Baron ("Baron") is
hereby ORDERED and compelled to withdraw the subpoenas he caused to be served through the
United States District Court for the Southern District of Florida in this case on October 16, 2012

on third-parties Domain Holding Group, Inc. and Jason Bashoff. Baron is further ORDERED to confine and limit his discovery to that which is expressly authorized in the Expedited Discovery Scheduling Order [doc. # 858] entered by Judge Jernigan in the parallel bankruptcy action. Finally, the Court ORDERS that the Agreed Protective Order [Dist. Ct. Doc. #14] of June 19, 2009 continues to apply to both Baron and his counsel.

Baron may not depart from Judge Jernigan's Scheduling Order without filing a motion to do so before Judge Jernigan. Otherwise, strict compliance with the Scheduling Order is required. As noted above, Baron and his counsel are subject to the Agreed Protective Order and any failure to abide by the Order will be viewed with great concern by this Court.

IT IS SO ORDERED.

SIGNED this 19th day of October, 2012.

Royal Furgeson
Senior United States District Judge

# TAB D

# Exhibit D

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

## UNITED STATES DISTRICT COURT

for the

Northern District of Texas

| | |
|---|---|
| NETSPHERE, INC., ET. AL. | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No.  3:09CV0988-F |
| JEFFREY BARON, ET. AL. | ) |
| _Defendant_ | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:      NAME.COM, INC, C/O AGENTS AND CORPORATIONS, INC
1201 ORANGE ST STE 600, Wilmington, DE 19801

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Exhibit A, attached hereto.

| Place: Brandywine Process Servers, Ltd.<br>2500 Delaware Avenue<br>Wilmington, DE 19806 | Date and Time:<br><br>01/22/2015 9:00 am |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 01/09/2015

CLERK OF COURT

OR

_____                    _____
_Signature of Clerk or Deputy Clerk_                    _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ _____
Jeffrey Baron _____ , who issues or requests this subpoena, are:
Leonard Simon, Pendergraft & Simon, LLP, 2777 Allen Pkwy, Suit 800 , Houston, TX 77019.  Phone: 713-253-2810

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.    3:09-CV-0988-F

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*   NAME.COM, INC n/k/a KRISHNAMACHARYA, INC.

on *(date)*    1/12/15

&#9974; I served the subpoena by delivering a copy to the named person as follows:

C/O AGENTS & CORPORATIONS, INC 1201 N. ORANGE STREET WILMINGTON, DE 19801

ACCEPTED BY: DAVID ZIGLER (authorized person)    on *(date)*   1/12/15    , or

□ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00

I declare under penalty of perjury that this information is true.

Date:   1/12/15

_____
*Server's signature*

DENORRIS BRITT
_____
*Printed name and title*

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360 WILMINGTON, DE 19899
800-952-2288
_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Exhibit A**

**DEFINITIONS:**

1) **Portfolio**  Two certain groups of domain names consisting of approximately 3,000 domain names owned by NovoPoint, LLC and approximately 150,000 domain names owned by Quantec, LLC.

2) **Accreditation Agreement**  Registrar Accreditation Agreement between you and the Internet Corporation for Assigned Names and Numbers (ICANN)

**SUBPOENAED DOCUMENTS:**

1. Concerning all domain names currently or previously registered by NovoPoint, LLC; Quantec, LLC; Domain Vault, LLC; Shawn Frazin (a/k/a Mort Katz, a/k/a Isaac Katz, a/k/a Dan Katz), Lisa Katz (a/k/a Elisa Katz), Gary Schepps, Christopher Payne or Andrew Powell, all documents containing information that you are required to maintain pursuant to your Accreditation Agreement, including:
   a. The name of the registered domain name (hereinafter "Registered Name");
   b. The IP addresses of the primary nameserver and secondary nameserver(s) for the Registered Name;
   c. The corresponding names of those nameservers;
   d. Unless automatically generated by the registry system, the identity of the Registrar;
   e. Unless automatically generated by the registry system, the expiration date of the registration; and
   f. Any other data the Registry Operator requires be submitted to it.
   g. Any correspondence concerning compliance with your agreement to ICANN's Uniform Domain-Name Dispute-Resolution Policy ("UDRP")
   h. The original creation date of the registration;
   i. The expiration date of the registration;
   j. The name and postal address of the Registered Name Holder (as defined in your Accreditation Agreement);
   k. The name, postal address, e-mail address, voice telephone number, and (where available) fax number of the technical contact for the Registered Name; and
   l. The name, postal address, e-mail address, voice telephone number, and (where available) fax number of the administrative contact for the Registered Name.
2. Documents sufficient to show funds received, and sources thereof, from NovoPoint, LLC.; Quantec, LLC; Domain Vault, LLC; Shawn Frazin (a/k/a Mort Katz, a/k/a Isaac Katz, a/k/a Dan Katz), Christopher Payne; Gary Schepps or Lisa Katz (a/k/a Elisa Katz) for registration of domain names for the period from January 1, 2010 to the present.
3. All contracts, agreements relating to the possession, management, valuation, sale or purchase of domain names in the Portfolio.
4. Any and all communications between you and NovoPoint, LLC.
5. Any and all communications between you and Christopher Payne
6. Any and all communications between you and Gary Schepps
7. Any and all communications between you and Quantec, LLC.
8. Any and all communications between you and Domain Vault, LLC.
9. Any and all communications between you and Shawn Money Frazin (a/k/a Mort Katz, a/k/a Isaac

Katz, a/k/a Dan Katz)

10. Any and all communications between you and Lisa Katz (a/k/a Elisa Katz).
11. Any and all agreements between you and NovoPoint, LLC.
12. Any and all agreements between you and Quantec, LLC.
13. Any and all agreements between you and Christopher Payne.
14. Any and all agreements between you and Domain Vault, LLC.
15. Any and agreements between you and Shawn Frazin (a/k/a Mort Katz, a/k/a Isaac Katz a/k/a Dan Katz).
16. All documents and electronically stored information showing gross income, hits, or other statistical data or analysis of each domain name in the Portfolio.
17. Documents sufficient to show money paid, including identification of recipient accounts, concerning domain names in the Portfolio

# TAB E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DOMAIN VAULT LLC.,                :
                                  :
                 Plaintiff,       :
                                  :
       v.                         :     Miscellaneous Case No. 15-52-RGA
                                  :
JEFFREY BARON,                    :
                                  :
                 Defendant.       :

### ORDER QUASHING SUBPOENA

Having been supplied with a copy of an order in Netsphere v. Baron, Civ. Act. No. 3:09-CV-0988-L (N.D. Tex. March 3, 2015), and having been advised that counsel for Baron was informed of this Motion on March 18, 2015;

IT IS HEREBY ORDERED this 25th day of March 2015, Domain Vault LLC's Motion to Quash Subpoena (D.I. 1) is hereby **GRANTED** as the subpoena "did not issue from a court [the NDTX] where an action pertaining to the information is pending." Fed. R. Civ. P. 45(a)(2).

The Clerk is directed to **CLOSE** this miscellaneous action.

_United States District Judge_

# Exhibit E